**GENERAL BAKING CO. v. GORDON,**
Secretary of Banking, et al.
No. 6783.

District Court, E. D. Pennsylvania.
Oct. 11, 1932.

On Reargument, June 8, 1933.

George E. Beechwood, of Conlen, La Brum & Beechwood, of Philadelphia, Pa., for plaintiff.

C. B. Wagoner and C. S. Wesley, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This cause was heard upon bill and answer. Consequently, the answer is to be taken as true in all particulars whether responsive to the bill or not (Leeds v. Marine Insurance Co., 2 Wheat. [15 U. S.] 380, 4 L. Ed. 266; Terral v. Burke Construction Co., 257 U. S. 529, 42 S. Ct. 188, 66 L. Ed. 352, 21 A. L. R. 186), and only such averments of the bill as are not controverted are to be taken as admitted.

Franklin Trust Company is a banking institution in the city of Philadelphia which at the close of the business day of October 5, 1931, was taken over for liquidation by the secretary of banking of Pennsylvania, and which, it may be assumed, is largely insolvent. This plaintiff is endeavoring to impress certain of the funds of the bank, now in the hands of the special deputy in charge, with a trust in its favor. The plaintiff's case depends upon the legal effect of an oral agreement between it and the trust company, made on October 25, 1925, and subsequently, on August, 1930, slightly modified. From the averments of the bill and answer, the arrangement was as follows:

The plaintiff, whose general offices were in New York, had three principal places of business or plants in the city of Philadelphia, and in addition made sales through a number of distributors located at various points outside Philadelphia in Pennsylvania and New Jersey.

The trust company agreed to accept from the Philadelphia plants cash, drafts, and checks; the same to be deposited in what was designated as "a deposit account" in the name of the plaintiff, and the cash together with the proceeds of the drafts and checks to be forwarded on Mondays and Wednesdays of each week to the plaintiff in New York. The bill avers that the trust company was to take the drafts and checks "for collection." The answer which purports to "qualify the allegations" of the bill says, "said deposits to be credited to the complainant * * * and on Monday of each week the balance in the deposit account * * * to be forwarded to * * * the General Baking Company in New York."

In addition to the foregoing, the parties designated certain out-of-town banks with which the trust company was to make arrangements by which the plaintiff's out-of-town distributors would deposit their moneys in such banks, subject to withdrawal only by check of the trust company; all money so deposited to be credited to the complainant's deposit account in the trust company upon the receipt by it of credit advices by the receiving banks, the proceeds to be forwarded to the plaintiff in New York on Mondays and Wednesdays along with the proceeds of the Philadelphia plants. The bill avers that the deposits in the out-of-town banks were to be "ear-marked as the funds" of the plaintiff. The "qualification" of the answer omits this averment.

The trust company undertook to make up and deliver weekly pay rolls in envelopes to the Philadelphia plants, collecting the deposits at the same time, when possible.

In addition to the deposit account, the plaintiff agreed to open another account with the trust company—this one a checking account designated at its "disbursement ac-

count." This account was to be kept entirely separate from the deposit account, and the plaintiff agreed that it would maintain it at an average balance of not less than $25,000 by means of weekly deposits from its New York office. Originally, the trust company had agreed to allow 2 per cent. interest on this account, but when, by the subsequent agreement, it was required to forward the balance in the disbursement account twice a week instead of once, as previously, the interest provision was eliminated.

The disbursement account was not subject to check, except that the original agreement contemplated that the parties might from time to time specially agree to permit the balances in the disbursement account to remain in the trust company for longer than semiweekly periods, in which case at the expiration of such agreed time the funds would be called by check of the plaintiff, instead of being sent to it in the usual way. Special agreements of this kind were made and carried out on three different occasions, at which times balances of $450,000, $440,000, and $100,000, respectively, were allowed to remain with the trust company for periods of a month or two.

When the trust company closed its doors, it had on deposit approximately $36,000 in the disbursement account. The plaintiff admits that it has no preferred claim as to this amount, and it is not involved in this case. There was $49,950.17 on deposit to the plaintiff's credit in the deposit account. In addition, the various out-of-town correspondent banks had accepted deposits of cash, drafts, and checks from the plaintiff's out-of-town distributors amounting in all to $32,403.26. The receipt of this amount had been noted on the books of those correspondent banks on Monday, October 5th, the last day on which the trust company was open for business, and credit advices as to it arrived at the trust company on the following day.

The plaintiff originally attempted to enjoin the special deputy in charge of the bank from collecting these funds, but, upon a stipulation made at the hearing of that proceeding, it was ordered that the defendants would collect and place this sum in escrow pending a decision by this court as to whom it should be paid.

It seems to be agreed that there was no segregation of the funds in the plaintiff's deposit account, but that whatever was received either direct from the plaintiff's plants in Philadelphia or from the out-of-town banks was mingled with the general funds of the trust company. Just what the whole arrangement between the trust company and the correspondent banks was does not fully appear. It is plain, however, that the original agreement between the plaintiff and the trust company contemplated that all the deposits in the correspondent banks were ultimately to be paid into the plaintiff's deposit account in the trust company and dealt with in exactly the same way as the money directly deposited by the plaintiff's Philadelphia plants.

■ After a careful consideration of all the matters before me, I am satisfied that the parties in this case did not create or contemplate a trust relation as to the deposit account, and that this applies equally to the money directly deposited by the plaintiff's Philadelphia plants and that received through the out-of-town correspondent banks.

■ The crux of the matter is whether it was intended that the trust company should have the use of the funds of this account during the brief periods for which they remained in its hands. It is extremely significant, though of course not conclusive, that the agreement between the parties does not contain any term expressly creating a trust relationship or any expression which even remotely suggests it. Even if the averment of the bill that the deposits were received "for collection" in the ordinary commercial sense could be taken as admitted (which is doubtful in view of the qualified answer), it would make little difference, since it is conceded that cash, drafts, and checks were all to go into the deposit account indiscriminately under the same terms, and of course it would be patently absurd to speak of accepting a cash deposit for collection. Nor was there any requirement that the plaintiff's deposit account was to be kept separate from the general funds of the trust company. The plaintiff was not to check upon it, and hence it was necessary to distinguish it in some way from its checking account, which appears to be the only reason for its name.

The fact that the parties contemplated and actually made subsequent arrangements by which large amounts of money in the deposit account were allowed to remain with the trust company for considerable periods without anything being said or done as to change the character of the deposit or the relationship created thereby is more than merely suggestive. What could be the purpose of these special arrangements unless it was understood all along that the money on deposit was being used by the trust company in its

general banking business and it was desired to give them the use of more money for a longer time?

The general arrangement is not unusual in the case of chain stores and the like which do their principal banking in one city but have branch stores which take in large amounts of money in other places. At first it is a little difficult to identify the relationship which it established, but upon examination it becomes clear enough. The trust company offered the plaintiff a service which relieved it of considerable difficulty and expense. Beside supplying its banking facilities for the transmission of the plaintiff's money to New York, it undertook the physical work of making the plaintiff's deposits both in Philadelphia and the surrounding territory as well as that of making up and delivering the plaintiff's pay rolls in Philadelphia. As the agreement originally stood, unless it could use the funds on deposit, it would receive practically no benefit from all this beyond what might accrue from the plaintiff's $25,000 checking account, on which it will be remembered interest at 2 per cent. was originally to be paid. Of course that account was desirable, but it is significant that, when the original agreement was modified so that the trust company was required to remit to New York twice a week instead of once, thus greatly reducing the average of the deposit account in its hand, it was relieved of paying interest on the checking account.

The creation of the separate checking account does not preclude the view taken by any means. The plaintiff in New York received immediate credit advice of all deposits made to its credit in the deposit account and probably at once credited them to its general funds in New York, and there may have been a number of reasons why it was convenient and desirable for it to keep this account intact for the semiweekly remittances.

■ The parties have argued the case as though there were two questions involved: First, the existence of the trust relationship; and, second, the traceability of the trust fund, if any. I agree with the plaintiff that the doctrine of Knatchbull v. Hallett, 13 Ch. Div. 696, is the law of both Pennsylvania and the federal courts, but its application depends upon a tortious intermingling of trust funds, because, as the court says, the presumption is that withdrawals so far as possible are honestly made from the trustee's own funds and therefore what is left would be trust money. If, however, the mingling of the funds is innocent, the reason of the rule fails. And, of course, it is innocent when both parties agreed or intended that it should be mingled. If, to go a step further, such was the agreement or intention, not only would there be no rule for tracing the trust, but there would be no trust. Any deposit by which money is to be used for the general business of the depository by its inherent nature creates the relationship of debtor and creditor and immediately negatives the existence of a trust.

All the questions argued in the case therefore depend upon the essential issue whether this deposit account was to be used by the trust company in its general banking business. I think that that was clearly the intention.

■ It follows that there is no essential difference in the character of the deposit account in the trust company and the deposits in the hands of the correspondent banks at the close of business on October 5th. It was understood that these would all go into the general deposit account. It was understood, therefore, that they would be mingled with, and used in the same manner as, the general funds of the bank. Upon the deposit being made in a correspondent bank, it was immediately credited to the trust company and thereafter was subject to withdrawal only by that company. Of course there must have been a physical segregation of these deposits in the hands of the correspondent banks for some brief period immediately after their receipt. Nor can the precise legal effect of their daily credit advices to the trust company be determined from the bill and answer. But what the parties intended as the ultimate disposition of the fund is the controlling factor. The mere fact that time and banking machinery were required to get these deposits into the general moneys of the trust company during which period they may have been susceptible of identification is unimportant, unless there were something definite to indicate that the parties intended that two different kinds of relationship should successively come into being with regard to these out-of-town deposits, namely, a trust relationship until they reached the deposit account and a debtor and creditor relationship thereafter. That would be a curious thing to do, and there is nothing of the sort in this case.

■ As to the jurisdictional question raised, I am satisfied that this court has jurisdiction. The secretary of banking is an administrative officer. His office exists by statute. He is appointed by the Governor and not by the court. He is not an equity receiver, and the

mere fact that the statute provides that he shall have the rights, powers, and duties of an equity receiver does not make him one, nor does the fact that the common pleas courts of the state are given jurisdiction to make certain orders and decrees relating to the conduct of the liquidation and rights in the fund mean that the fund is in the custody of the court. That depends entirely upon the nature of the office of the liquidating officer and the power from which he derives his authority.

The general conclusion is that there is no trust relationship as to either of the funds involved in this suit and the plaintiff is not entitled to a preferred claim against the estate of the Franklin Trust Company, but has merely the status of a depositor.

The bill may be dismissed, with costs.

### Sur Reargument.

The amendments allowed by the court do not affect the issues presented by the original pleadings as the court understood them. The amendments were allowed so that parties might not be prejudiced upon appeal by averments which they felt might cause misunderstanding. The court, however, in deciding the case, took the averments of paragraph 24 of the bill and corresponding paragraph of the answer to mean that the mingling of the specific funds in controversy was admitted to have taken place without the specific or express consent or approval of the plaintiff, but the court was of the opinion that the original agreement contemplated the use by the trust company in its general business of all funds deposited and of necessity authorized their commingling with its other general funds.

Upon the reargument the plaintiff strongly insisted that the court accepted as a basis for its decision numerous averments in the answer which were no more than conclusions of law or "averments of defendants' interpretation of the exhibits and of the oral contract." This calls for a brief re-examination of the issues, keeping in mind the elementary proposition that upon hearing of bill and answer "the whole answer is to be taken as true; or in other words, the truth of all the well pleaded averments of the answer, whether responsive to the allegations of the bill or in avoidance thereof is admitted, the cause in effect being submitted to the court on the contention that plaintiff is entitled to the decree prayed for in his bill upon the admissions and notwithstanding the denials of the answer." 21 C. J. 560.

Now the agreement upon which the plaintiff bases its right, according to the bill, was an oral agreement subsequently orally modified in one or two particulars. It is averred that certain letters passed between the parties and these letters may be considered as evidence bearing upon the intention of the parties in the oral agreement. But there is no averment that the letters were intended as an integration of the agreement, and it is obvious that they were not. For the terms of the oral agreement the court must look to the answer, and only such allegations of the bill with regard to the terms as are not denied or modified by the allegations of the answer may be added thereto. Of course, the court understands that this does not extend to matters of opinion or inference or conclusions of law contained in the answer. But we are dealing with an oral agreement as to which it is not expected that the precise words will be set forth. So that, when the answer says that the parties agreed orally to certain things, unless it clearly appears that these averments are conclusions of law or mere inferences, they must be taken at their face value, namely, as statements that, as matters of fact, the parties used the words substantially in accordance with the averment of the answer. If an answer states that "the defendant orally agreed to pay $1,000 for an automobile," that is not stating a legal conclusion or inference, but is stating a fact.

Now the really vital part of the oral agreement is stated in paragraph 8, subsection (c), of the bill, and the answer to that is as follows: " * * * General Baking Company, the complainant, agreed to open a 'deposit account' in the Franklin Trust Company, wherein all moneys (including checks, cash and drafts) received by the three Philadelphia plants of the complainant were to be deposited, said deposits to be credited to the complainant, advices of each deposit to be forwarded to the offices of the General Baking Company in New York, and on Monday of each week the balance in the deposit account (as augmented by the funds received under the terms and conditions hereinafter set forth) to be forwarded by the Franklin Trust Company to the General Baking Company in New York or its depository." It is true that this same paragraph of the answer refers to the letters passing between the parties ("the exhibits to the amended bill of complaint as amended"), but there is no averment or suggestion that these letters constituted the agreement. On the contrary, the

statement is that the agreement was oral and the letters are clearly referred to me as evidentiary of the intention of the parties.

█ The general rule is too well settled to admit of question that, in the absence of any special agreement providing for a trust or agency, a deposit in a bank to be credited to the depositor creates the relationship of a debtor and creditor. It is agreed of course that this was not an ordinary deposit, but that it was made under a special agreement of some kind. Whether it was the purpose of this special agreement to create a trust relationship or whether it was merely to provide certain incidents as to transmission of balances, receipts of deposits, making up pay rolls, etc., for the convenience of the parties, was the matter at issue. The court did not exclude the letters from its consideration, but carefully considered all their terms, as though they had been incorporated into the oral agreement or as though the agreement had been partly oral and partly written. The court is still of the opinion that the evidence before it fails to show any intention to deny to the trust company the right to use the funds deposited with it in what was called the deposit account.

█ The plaintiff has made the point as to the sum of $40,642.67 deposited with the trust company on Saturday, October 3, that, regardless of any general arrangement, a trust arises because (a) the trust company was obligated to deliver this amount in cash to the plaintiff's depository in New York on Monday, October 5, and failed to do so. This argument, however, only goes to the general intention of the parties. If I thought that the letters relied upon by the plaintiff of September 9 and 11, 1925, meant that the trust company was bound to deliver to the plaintiff's depository in New York the identical currency, bills, and coin received by it, I would have to revise my view as to the major intention of the parties in the whole transaction. This, however, was certainly never intended. Nor do I think that there was any intention that currency in specie was to be physically transported from the trust company's New York correspondent to the plaintiff's New York depository. The letters of September 9 and 25 refer to "cash funds" and "current funds." All that the plaintiff is insisting upon is that banking arrangements be made so that the amount of money reaching the trust company's New York correspondent on Monday be in its depository available to be drawn upon by the afternoon of the same day. The plaintiff objected to the use of cashier's checks on the trust company's New York correspondent because they had to be cleared and consequently could not be drawn upon on the same day. Any arrangement which would make the credit balance available on Monday was satisfactory to the plaintiff. I find nothing in this correspondence inconsistent with the intention that the deposit while in the trust company's hands should be used for its general banking purposes.

There are also cases of course which hold that, in the absence of any trust agreement, the receipt by a bank of deposits at a time when it knows it is insolvent, will create a trust ex maleficio. Ellerbe v. Studebaker Corporation (C. C. A.) 21 F.(2d) 993. The trouble with this position is that there is nothing in the bill and answer from which the court can find that the trust company was insolvent on October 3, or at any time prior to the closing of its doors on October 5.

█ Nor can a trust be implied from the failure of the trust company to pay the amount of deposits which it had on hand to the plaintiff's New York depository on Monday, October 5. If the original agreement did not contemplate or create a trust, the fact that it has been broken will not accomplish that result. Otherwise any general depositor could turn his general deposit into a trust merely by presenting a check and having payment refused. If the relationship was that of debtor and creditor, the fact that the debtor failed to pay in accordance with the terms of the agreement does not constitute it a trustee.

The court has carefully considered all the arguments presented in the plaintiff's comprehensive and well-considered brief, but adheres to the views expressed in the original opinion and reaffirms the order for the dismissal of the bill.